IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| EDWARD MANDEL, | § | |
| | § | |
| *Appellant,* | § | |
| | § | CIVIL ACTION No. 4:15-cv-715 |
| v. | § | |
| | § | JUDGE RON CLARK |
| STEVEN THRASHER, ET AL., | § | |
| | § | VSL |
| *Appellees.* | § | |

## MEMORANDUM OPINION ON APPEAL FROM BANKRUPTCY COURT

This matter, involving a dispute over the allowability of the proofs of claim filed by Steven Thrasher and Jason Coleman ("Claimants") in the bankruptcy court below, is before this court yet again. The Claimants alleged that the total amount of their claims exceed $80 million, based on various causes of action arising out of a failed business venture. The debtor, Edward Mandel, objected to the claims, requesting that the bankruptcy court disallow the claims in their entirety.

Following a trial over twelve nonconsecutive days in a four-month span, the bankruptcy court concluded that the Claimants had established some of their causes of action against Mandel, including breach of contract, fraud, breach of fiduciary duty, and misappropriation of trade secrets. On September 30, 2011, the bankruptcy court entered an Order awarding $1,000,000 to Thrasher, $400,000 to Coleman, and $300,000 to White Nile in compensatory damages, as well as $1,500,000 in attorney's fees ("September 30, 2011 Order").

Mandel and the Claimants appealed the September 30, 2011 Order. This court affirmed that Order ("District Court Order"). Mandel and the Claimants appealed the District Court Order. The Fifth Circuit found that "Thrasher and Coleman did suffer some damage" but vacated the

bankruptcy court's award of compensatory damages and directed the bankruptcy court to "either conduct an additional evidentiary hearing on the issue of damages or explain its award of damages on the basis of the evidence in the present record." Fifth Cir. Op'n, Dkt. # 21-6, at p. 23.[1]

On September 30, 2015, the bankruptcy court entered its Memorandum Opinion and Order on Remand ("Memorandum Opinion on Remand"), in which the bankruptcy court awarded Thrasher $1,000,000 in compensatory damages, awarded Coleman $400,000 in compensatory damages, and denied Mandel's request to vacate the bankruptcy court's prior award of attorney's fees. Claimants filed a Motion to Reconsider, arguing that the Fifth Circuit broadly vacated and remanded the award of compensatory damages as to all three claimants, including White Nile, and requesting the bankruptcy court to issue supplemental findings and conclusions with respect to the compensatory damages previously awarded to White Nile. On March 23, 2016, the bankruptcy court entered its Order Denying Claimants' Motion for Reconsideration ("Order Denying Reconsideration"), in which it held that the Fifth Circuit vacated only the compensatory damages awards to Thrasher and Coleman, and not the award to White Nile. In the Order Denying

---

[1] During the pendency of the appeals of the September 30, 2011 Order, the bankruptcy court appointed a chapter 11 trustee for Mandel's bankruptcy estate. The chapter 11 trustee requested approval of a settlement agreement allowing the claims of Thrasher and Coleman against the bankruptcy estate in the amounts set forth in the September 30, 2011 Order. The bankruptcy court entered an order approving the settlement agreement on November 6, 2013. On December 19, 2014, the bankruptcy court entered an order granting Mandel's motion to convert his case to a chapter 7 case.

The amount of the claims of Thrasher and Coleman has been settled with the estate. However, the amount of compensatory damages at issue here may still be relevant in the event that the bankruptcy court denies Mandel a discharge under 11 U.S.C. § 727 or finds that his debts to the claimants are non-dischargeable in bankruptcy under 11 U.S.C. § 523. *See also In re Mandel*, 641 F. App'x 400, 405 (5th Cir. 2016) (holding that Mandel, as debtor, has standing to appeal the bankruptcy court's Claim Allowance Order until and unless the bankruptcy court discharges the debt that is the subject of the Claim Allowance Order). At this time, the bankruptcy court has not yet issued a ruling on the Discharge Complaint.

Reconsideration, the bankruptcy court also stated that in the event it had misread the Fifth Circuit opinion, it would increase White Nile's compensatory damages award from $300,000 to $497,000.

Appellant Edward Mandel ("Mandel") and Cross-Appellants Jason Coleman ("Coleman"), Stephen Thrasher, individually ("Thrasher"), and Stephen Thrasher derivatively on behalf of White Nile Software Inc.[2] appeal the bankruptcy court's Memorandum Opinion on Remand. Cross-Appellants also appeal the bankruptcy court's Order Denying Reconsideration. For the reasons that follow, the bankruptcy court's Memorandum Opinion on Remand and Order Denying Reconsideration are reversed in part. The bankruptcy court's compensatory damages award to White Nile is increased from $300,000 to $497,000. The bankruptcy court's Order Denying Reconsideration and Memorandum Opinion on Remand are affirmed in all other respects.

## I.     FACTUAL BACKGROUND

The record in the bankruptcy case below is one of the lengthiest records in the history of the United States Bankruptcy Court for the Eastern District of Texas. The main proceeding and its many adversary proceedings have spun several appeals. The facts that pertain to this appeal are as follows.

Thrasher, an intellectual property attorney, met Mandel in 2001, and the two soon became friends. In May 2005, Thrasher thought of an idea for a new kind of search engine. Mandel represented to Thrasher that he had expertise with internet databases that would be used to store an index for a search engine and that he was familiar with database search engines. Mandel and Thrasher signed non-disclosure agreements.

---

[2] MaddenSewell, LLP and the Law Offices of Mitchell Madden join in the cross-appeal as partial assignees of the Thrasher claims. For simplicity, Thrasher, MaddenSewell, LLP, and the Law Offices of Mitchell Madden are referred to as "Thrasher" when bringing claims in Thrasher's individual capacity, and they are referred to as "White Nile" when bringing claims on behalf of White Nile.

Subsequently, Thrasher submitted a provisional patent application, entitled "System, Methods, and Devices for Searching Data Storage Systems and Devices" to the United States Patent and Trademark Office on July 2, 2005. Thrasher is the only inventor listed on this application.[3]

Mandel and Thrasher formed White Nile to develop the search engine. Mandel represented that he would pay for the development of a prototype of the search engine, which they anticipated would cost $300,000. Mandel, through his attorney at the time, filed articles of incorporation with the Texas Secretary of State on July 13, 2005. These articles named Thrasher and Mandel as directors of White Nile.

In August 2005, Thrasher obtained a trademark for White Nile. In the same month, Thrasher signed a consulting agreement with White Nile that named him co-founder, inventor, and chief executive officer. In October 2005, Mandel signed a consulting agreement with White Nile, naming him co-founder and president. In the agreement, Mandel also assigned White Nile any "patentable ideas." Thrasher assigned his intellectual property relating to certain search-engine technology to White Nile.

Mandel and Thrasher met with representatives of Meaningful Data Solutions ("MDS"), who agreed to help develop software for the White Nile search engine. MDS anticipated that the project would cost $216,500, and Mandel told Thrasher that he would pay that amount.

Thrasher and Mandel also signed a Unanimous Consent, naming Mandel as president and treasurer of White Nile, and Thrasher as its chief executive officer and secretary. Thrasher and

---

[3] On August 29, 2005, Thrasher filed a second provisional patent application entitled "System, Methods, and Devices for Searching Data Storage Systems and Devices," and again listed himself and only himself as the inventor on the application. On December 13, 2005, Thrasher submitted a third provisional patent application to the USPTO, entitled "Real-Time Search Visualization," listing only himself and Jason Coleman as inventors on the application.

Mandel were also each to receive 26 million shares of White Nile in exchange for the following consideration: (a) Thrasher assigning his then-existing provisional patent application as well as any future intellectual property to White Nile; and (b) Mandel developing White Nile's search engine at Mandel's expense by December 31, 2005.

Mandel and Thrasher also met with Paul Williams. Mandel and Williams led Thrasher to believe that Williams was a licensed broker/dealer at Hughes-Roth Capital Markets and that White Nile was retaining Hughes-Roth Capital Markets to secure Williams's services. This was a lie.

White Nile retained Jason Coleman as chief creative officer and co-founder to develop a graphic representation of what the search engine might look like. The agreement provided that Coleman would receive an annual salary of $133,000, as well as 0.5% equity interest in White Nile, but Coleman agreed to defer his salary for the first several months while White Nile was seeking investors. Coleman also assigned his work product, including patentable ideas, to White Nile. Coleman began working full time for White Nile in October 2005. He referred to his work on a prototype as the SAQQARA project. In addition, he and Thrasher filed for and received a patent, referred to by the parties as the '802 patent, during this time. Mandel assured Coleman that White Nile was in good financial shape. Coleman completed his work as promised under the agreement but never received an equity interest.

When Mandel realized that White Nile was unable to reach an agreement with MDS, Mandel represented to Thrasher that a friend's father, Eduardo Carrasco, had political connections in the Philippines that would allow White Nile to develop its search engine in the Philippines, which would save White Nile money. Mandel represented to Thrasher and Coleman that Eduardo had hired a team of individuals with PhDs to develop a prototype of White Nile's search engine in the Philippines. Mandel visited the Philippines in fall 2005 and represented to Coleman that he

had met with the developers working for White Nile. Thrasher included these representations in a written presentation to potential investors.

Next, White Nile recruited Rod Martin, one of Thrasher's friends, to serve on White Nile's Board of Directors. Around the same time, White Nile hired Skinner Layne as an employee. Skinner convinced his parents, Eddie and Ellen Layne (the "Laynes"), to invest $300,000 in White Nile, in exchange for 75,000 shares of stock.

In November 2005, Thrasher, Mandel, and Coleman traveled to Philippines, where Thrasher and Coleman learned that no one had been working on While Nile's search engine and that no one in the Philippines had expressed an interest in investing money in White Nile. In fact, Mr. Carrassco had only expressed interest in being *paid* in excess of $1 million in return for providing services to White Nile. During the trip, Thrasher and Coleman began to discover that Mandel was not very knowledgeable about the type of database or programming necessary for the search engine to function. During the visit, Coleman, Thrasher, and Mandel discussed changing the name of White Nile. One potential name was "NeXplore," but they did not reach an agreement. Ultimately, Mr. Carrasco declined to become involved with White Nile. Subsequently, Mandel recruited Joseph Savard to become White Nile's Chief Technology Officer.

On December 15, 2005, Williams held an investor meeting in Arkansas using Coleman's demonstratives. The following day, Thrasher discovered that Williams was not a licensed broker. By this point, Mandel and Thrasher's relationship was disintegrating. It became evident that Mandel did not intend to contribute any of his own funds to White Nile despite his previous representations.

Mandel and Skinner formed a new company called NeXplore. Around the same time, Mandel began denying that Martin was a member of White Nile's board of directors. Mandel

recruited Savard to work for NeXplore at some point during late December or early January 2006. NeXplore offered Savard the same job title and salary as White Nile. Mandel also recruited Williams to work for NeXplore, where Williams would perform the same advisory role as he had at White Nile.

At that time, Thrasher submitted instructions to White Nile's bank to make a payment to his father to reimburse him for hardware he had purchased for White Nile. Around the same time, Mandel also submitted instructions to the bank, requesting the bank to place all of the funds in White Nile's account into a new account under Mandel's sole control. Due to the conflicting statements, the bank froze the account. That account held $197,000, the remaining balance of the $300,000 that the Laynes had invested in White Nile.

Thrasher and Martin met with Mandel to discuss the situation. Mandel did not tell Thrasher or Martin that he was forming NeXplore, or that Mandel had asked the Laynes to move their invested funds from White Nile to NeXplore. Later, Thrasher and Martin discovered that Mandel had convinced the Laynes to move their $197,000 invested in White Nile to NeXplore, and that NeXplore had received $286,500 from Arkansas Investment, a limited liability company formed by the Laynes after the December 15, 2005 White Nile presentation.

In January 2006, Mandel, Williams, and Skinner signed corporate documentation purporting to remove Thrasher from White Nile's board of directors as well as a document declaring that White Nile was no longer a going concern. The document also purported to release everyone from various non-competition and non-disclosure agreements they had signed with White Nile. The document did not, however, release Thrasher from the assignment of his intellectual property to White Nile, but Mandel did not seek to preserve or protect White Nile's intellectual property.

## II.    PROCEDURAL BACKGROUND

**A.    Mandel sparks litigation in state court.**

In January and February 2006, Coleman approached Mandel and Thrasher seeking payment for work performed for White Nile. Coleman requested a cash payment of $38,791.66. Thrasher agreed to mortgage his house to pay his half of the amount. Mandel did not offer to make any payments to Coleman. Instead, Mandel caused White Nile to sue Coleman for allegedly breaching his consulting agreement and attempting to extort money from White Nile. Coleman and Thrasher asserted counterclaims against Mandel for breach of fiduciary duty, breach of contract, conversion, theft of corporate opportunities, and theft of trade secrets. In late 2006, Coleman began working on the '802 patent again by refining and extending its inventions, among other things. The PTO issued a patent to Thrasher and Coleman, which NeXplore unsuccessfully challenged.

Mandel, Skinner, and Skinner's father (Eddy) marketed NeXplore to potential investors in 2006 and early 2007. During this time, Mandel and others raised approximately $2.5 million for NeXplore. On June 21, 2007, the State of Arkansas Securities Department issued a Cease and Desist Order that detailed NeXplore's investment scheme and funds. During this time period, NeXplore was unsuccessful at developing a usable product. Savard was unable to create the software that Mandel envisioned, and Mandel and the programmers disagreed about NeXplore's advertising. Savard's and Mandel's relationship began to deteriorate, and Savard left NeXplore in November 2006. The relationship between Skinner and Mandel also deteriorated, and Skinner left NeXplore almost a year later.

On October 17 and 19, 2007, the parties in the state court litigation (Mandel, Coleman, Thrasher) reached a tentative settlement, in which Thrasher and Coleman were to receive $450,000

paid in installments or if the payments were not made, an agreed judgment of $900,000. The settlement also provided for a royalty fee of two percent of NeXplore's gross revenue for five years in return for agreement to license their payments to NeXplore. They announced the settlement in open court, but Mandel later withdrew from the settlement. Thrasher and Coleman attempted to enforce the contract by, among other things, asserting claims against Mandel for breaching the agreement. The state court eventually entered a summary judgment order holding that the settlement agreement was unenforceable.

**B.      Mandel files for bankruptcy.**

On January 25, 2010, Mandel filed a petition for Chapter 11 bankruptcy in the Eastern District of Texas. Mandel listed the value of his 33 million shares in NeXplore as "unknown" in his bankruptcy schedules. Thrasher submitted a general unsecured claim in the amount of $56 million on behalf of himself and derivatively on behalf of White Nile, and Coleman submitted a general unsecured claim in the amount of $25 million. (Claim Nos. 20, 32). In their proofs of claim, Thrasher, Coleman, and White Nile asserted the following claims: (1) theft or misappropriation of trade secrets in violation of Texas Theft Liability Act (Texas Civil Practice and Remedies Code §§ 134.001, *et seq*.); (2) breach of contract; (3) breach of fiduciary duty; (4) fraud and fraudulent inducement; and (5) oppression of shareholder rights. Mandel objected to all of these claims and asserted various counterclaims against both Thrasher and Coleman.

The bankruptcy court tried Mandel's objections to the claims of Thrasher, Coleman, and White Nile over eleven nonconsecutive days from November 2010 to February 2011. The bankruptcy court found Mandel liable for (1) theft or misappropriation of trade secrets; (2) breach of contract; (3) breach of fiduciary duty; (4) fraud and fraudulent inducement; (5) oppression of shareholder rights; and (6) conspiracy. The bankruptcy court awarded $400,000 in damages to

Coleman, $1,000,000 to Thrasher, and $300,000 to White Nile. The bankruptcy court did not award any party exemplary damages. The bankruptcy court awarded Thrasher and Coleman $1.5 million in attorneys' fees and $255,989.48 in costs. The bankruptcy court denied all of Mandel's counterclaims. Mandel appealed the bankruptcy court's decision, and Thrasher and Coleman cross-appealed.

**C.     The Fifth Circuit remands the case to the bankruptcy court for an explanation of its award of damages to Thrasher and Coleman.**

On appeal, this court affirmed the bankruptcy court's decision in its entirety. Both Mandel and the Claimants appealed the District Court Order. On August 15, 2014, the Fifth Circuit affirmed in part the District Court Order, vacated the award of compensatory damages, and remanded to the bankruptcy court for further proceedings consistent with its opinion. The Fifth Circuit reasoned that

> [in] the present case, the bankruptcy court did not make clear the theory upon which it was relying to award damages nor did it explain the evidence supporting the amount of damages. While it is true that uncertainty should not preclude recovery in a trade secrets misappropriation case, Thrasher and Coleman were required to produce enough evidence to show "the extent of the damages as a matter of just and reasonable inference, even if the result be only approximate." From the bankruptcy court's opinion, we do not see an approximation—only numbers chosen by the court. . . . Even under our "flexible approach" to damages in a misappropriation of trade secrets case, the damages awarded must have some rational relationship to the evidence presented. . . .
>
> Because neither the bankruptcy court nor the district court explained the evidentiary and legal basis for the damages awarded, we are unable to review the damages adequately. Because, however, Thrasher and Coleman did suffer some damage, we vacate the award of compensatory damages and remand to the bankruptcy court so that it may either conduct an additional evidentiary hearing on the issue of damages or explain its award of damages on the basis of the evidence in the present record.

Fifth Cir. Op'n, Dkt. # 21-6, at p. 22–23.

**D.      On remand, the bankruptcy court further explains its award of damages.**

On remand, the parties submitted additional briefing on the issue of damages but declined an opportunity to present further evidence.  Based upon the parties' briefing and the record in the case, on September 30, 2015, the bankruptcy court entered its Memorandum Opinion and Order on Remand.  This court will discuss the award to Thrasher first, followed by the award to Coleman, then the attorney's fee award, and finally the award to White Nile.

**1.      Award to Thrasher**

The bankruptcy court awarded $1,000,000 in compensatory damages to Thrasher for misappropriation, $300,000 of which was also attributable to fraud.  The bankruptcy court held that Thrasher's damages for breach of contract, breach of fiduciary duty, and conspiracy were likewise subsumed in the damages award for misappropriation.  The bankruptcy court supported its award of damages to Thrasher with the following explanation:

> Shareholder oppression cannot be a source of compensatory damages (as discussed by the Fifth Circuit).  With respect to the remainder of his claims, Thrasher argued that his actual damages overlapped with, and were subsumed by, the damages arising from Mandel's misappropriation of trade secrets.  The bulk of Thrasher's damages argument at trial was how to measure the damages, if any, arising from Mandel's misappropriation.  Thrasher primarily relied on the testimony of his expert, Brad Taylor, to support an award of $56 million (or more).

> As noted by the Fifth Circuit:

>> Damages in misappropriation cases can take several forms:  the value of plaintiff's lost profits; the defendant's actual profits from the use of the secret; the value that a reasonably prudent investor would have paid for the trade secret; the development costs the defendant avoided incurring through misappropriation; and a reasonable royalty.

> *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 879 (5th Cir. 2013) (quoting *Bohnsack v. Varco, L.P.*, 668 F.3d 262, 280 (5th Cir. 2012)).  In this case, the nature of the misappropriation made it difficult to prove the amount of damages with certainty.  Such uncertainty does not preclude the recovery of compensatory

damages. Nonetheless, Thrasher and Coleman were required to establish the extent of their damages as a matter of just and reasonable inference. *See Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 839 (5th Cir. 2013).

White Nile and NeXplore never made a profit. White Nile only had one investor—the Laynes. Inasmuch as the Laynes were the parents of an employee, Skinner, their investment was not an arms-length transaction. Further, the Laynes had received inaccurate information about White Nile when they invested, and Mandel returned the Laynes' money to them when he took over White Nile. White Rock Capital refused to invest in White Nile in its early developmental stage. Eduardo Carrasco also refused to invest in White Nile and placed no value on an equity interest in White Nile.

With respect to development costs, Thrasher estimated White Nile would require investments of between $6 million and $12 million to bring a usable product to market. Carrasco requested more than $1 million to begin developing Thrasher's idea for a search engine. The development never occurred. At the time Mandel misappropriated White Nile's trade secrets, the search engine had not been developed beyond the alleged "prototype" stage. Neither White Nile nor NeXplore developed a usable product that could be brought to market. Under these circumstances, the avoidance of development costs by Mandel through misappropriation cannot be an appropriate measure of damages.

Thrasher and Coleman argued in closing that some evidence of a reasonable royalty can be found in the settlement agreement announced in state court. In state court, Thrasher, Coleman and Mandel announced that they had reached an agreement to a judgment of $900,000 in favor of Thrasher and Coleman. They announced that Thrasher and Coleman would not seek to enforce this judgment provided they received cash payments in the total amount of $450,000. In addition to cash payments, the parties agreed to a "royalty fee" of two percent of NeXplore's gross revenue for five years, payable quarterly, with a minimum quarterly payment of $2,500. Although NeXplore never created a product that could have generated revenue, the announced settlement agreement suggests an appropriate damages award would be $1,010,000, consisting of the $900,000 agreed judgment, a royalty fee of $30,000 for three years of minimum quarterly payments of $2,500 per quarter, and a royalty fee of $80,000 arising from a two-year license Mandel testified NeXplore signed in October 2010.[5]

In their closing arguments, Thrasher and Coleman also advanced a "lost asset" theory of recovery. They argued that White Nile had a fair market value of $56 million based on Mr. Taylor's expert testimony. They further argued they had lost the value of this asset as a result of Mandel's conduct.

---

[5] As previously discussed, the parties ultimately did not consummate the announced settlement agreement. (footnote in original).

In reaching his conclusion of value, Taylor selected 34 comparable companies focused on similar technology and business characteristics ranging in value from $1 million to $344 million. Taylor's report included the value of some of the largest internet search companies, including Google, Yahoo, and Ask Jeeves. While Mr. Taylor used these companies to run statistical models, he did not adjust for risks specific to White Nile.[6] As Vanessa Fox testified at trial, many internet companies fail—even companies with significantly more expertise and venture capital than White Nile.[47] The claimants' own expert, Dr. Gilbert Amelio, testified that even when companies succeed in attracting investments from venture capitalists, in his experience, approximately 80% of those companies will fail.

Significantly, the quality of White Nile's executive team was not a factor included in Taylor's analysis. Dr. Amelio testified that the information would have been important to a decision to invest in White Nile. All companies are people companies, according to Amelio, and they succeed only if their executive team is capable of transforming an idea into a viable business. White Nile's executive team did not have this ability.

Value, particularly in start-up companies, is dynamic. As Dr. Amelio testified, it changes with how efficient the company is at executing its business plan. Thrasher also recognized that value can change as competitors bring their own products to market.

In this case, even before the misappropriation occurred, White Nile was having difficulty raising the funds necessary for development costs in sufficient time to beat competitors. White Nile's dysfunctional executive team meant it was never a highly valuable company. Its value declined precipitously as the relationship between Mandel and Thrasher deteriorated, litigation ensued, and time passed. Dr. Amelio testified, credibly, that a nascent company engaged in litigation is not attractive to venture capitalists. Taking into account the significant rate of

---

[6] Taylor prepared his expert report in May 2009 in support of Thrasher and Coleman's claims in the state court litigation. He supplemented his report on October 22, 2010, which was shortly before trial began in this Court. In his supplemental report, Taylor stated that he believed White Nile's value was substantially higher than $56 million based on Dr. Amelio's expert report as well as the issuance of patents to Thrasher and Coleman. Dr. Amelio, however, had relied upon Mr. Taylor's expert report in reaching his conclusions about the value of White Nile. (footnote in original).

[7] One of the internet companies referenced by Taylor in his expert report had failed by the time of trial, according to the testimony of Ms. Fox. Ms. Fox also testified, credibly, that the Venn diagram display of search results envisioned by Thrasher was not astonishingly unique and had been discussed in relevant literature for a number of years. (footnote in original).

failures, the dysfunctional executive team, the lack of a functional product, NeXplore's abandonment of its efforts to create its own search engine, and the lack of profits by White Nile and NeXplore, it appears that White Nile's value is closest to the lowest valued company on Taylor's list of companies, which is $1 million.[8]

Thrasher and Coleman also argue an alternate theory of damages based on the benefit Mandel received from his misappropriation, namely a 55% interest in NeXplore.[59] According to the claimants' expert, Brad Taylor, the market capitalization of NeXplore was $47.17 million at the high end and $1.67 million at the low end—thus indicating a range of $25.0 million to $920,000 for the value of Mandel's 55% interest. White Nile was a nascent search market company with no financing, no usable product, no customers, no profit, and a dysfunctional executive team who engaged in litigation over control of White Nile and its intellectual property. This Court, therefore, again looks to the low end of the market capitalization spectrum for NeXplore in calculating damages for misappropriation, which is $920,000.

In determining damages, the Court also considered the amount of investments NeXplore secured using ideas and materials very similar to those prepared for White Nile. Setting aside the fact that NeXplore's recruitment of investors during 2006 and 2007 violated applicable laws, NeXplore raised approximately $2.5 million from investors before abandoning its attempt to create its own search engine. This would indicate a value of $1,375,000 attributable to Mandel's 55% interest in NeXplore.

The Court, considering all of the evidence presented at trial, concludes that Thrasher incurred damages as a result of Mandel's misappropriation in the amount of $1 million. Thrasher's damages for misappropriation are co-extensive with and subsume the damages he incurred on account of his other compensable claims against Mandel.

Mem. Op'n on Rem., Dkt. # 21-7, at p. 13–18.

---

[8] This value is remarkably similar to the damages arrived at using the settlement announced by the parties in state court. (footnote in original).

[9] Although Thrasher and Coleman complain about the salary and other benefits Mandel received from NeXplore, the trial record did not establish that Mandel received his salary or benefits on account of misappropriation. Indeed, Mandel worked for NeXplore for a number of years—even after NeXplore abandoned any attempt to create a search engine of its own. (footnote in original).

## 2. Award to Coleman

Second, the bankruptcy court awarded $400,000 in compensatory damages to Coleman for his claims for fraud, conspiracy, and misappropriation of trade secrets. The bankruptcy court supported its award of damages to Coleman with the following explanation:

> With respect to Coleman, an appropriate measure of damages is not based on the value of White Nile, but on what Coleman would have received under the consulting agreement for the services he rendered, including developing the SAQQARA project and the 802 patent. In contrast to Thrasher, Coleman's interest in White Nile was primarily as a paid consultant, and his arguments for damages in the pre-trial order and in closing referenced his expectations under the consulting agreement. If matters had proceeded as initially planned under the consulting agreement, his intellectual property would have remained assigned to White Nile.
>
> Coleman's consulting agreement, as previously discussed, provided Coleman would receive a salary of $133,000 for three years, with a possibility of an extension of the consulting agreement to future years, plus warrants for an approximately 0.5% equity interest in White Nile. Based on the Court's valuation of White Nile, the value of a 0.5% an [sic] equity interest in White Nile is approximately equal to the amount paid Coleman. Coleman's damages for misappropriation are subsumed by and co-extensive with his fraudulent inducement damages. Thus, considering all of the evidence admitted at trial, the Court determines that Coleman incurred damages in the amount of $400,000 as a result of Mandel's misappropriation and fraudulent inducement.

Mem. Op'n on Rem., Dkt. # 21-7, at p. 18–19.

## 3. Award of Attorney's Fees

Third, the bankruptcy court denied Mandel's request to vacate its prior award of attorney's fees. The bankruptcy court reasoned:

> On appeal, Mandel challenged the award of attorneys' fees to Coleman. The Fifth Circuit expressly rejected Mandel's challenge in its opinion. The only issue vacated and remanded to this Court is the award of compensatory damages of $1,000,000 to Thrasher and $400,000 to Coleman. This Court, therefore, declines to vacate the award of attorney's fees.

Mem. Op'n on Rem., Dkt. # 21-7, at p. 11–12.

**E.**     **The bankruptcy court denies a Motion to Reconsider with respect to its prior award to White Nile.**

Coleman, Thrasher, and White Nile filed a Motion to Reconsider with the bankruptcy court, arguing that it erred in failing to issue supplemental findings and conclusions with respect to the $300,000 in compensatory damages previously awarded to White Nile. The bankruptcy court stated that it was unconvinced that the Fifth Circuit intended for it to re-examine the compensatory damages previously awarded to White Nile, but nonetheless addressed the award in a detailed opinion, noting that in the event that the bankruptcy court had misread the Fifth Circuit's opinion, the court would increase the $300,000 award to White Nile by $197,000, for a total award of $497,000 in compensatory damages. Order Denying Recon., Dkt. # 14-1, at p. 81. Relevant to this Opinion, the bankruptcy court explained:

> Mandel breached his duty of loyalty to White Nile by diverting the remaining $197,000 of the investment made by Skinner's parents. Mandel thereby deprived White Nile of investment opportunities with respect to those funds. However, with the exception of the $197,000 transferred from White Nile's bank account, White Nile failed to show that it had a legitimate expectation in the investments received by NeXplore or that White Nile would have received the investments but for Mandel's breaches of his fiduciary duty.
>
> White Nile did not establish that Skinner's parents would have invested additional funds with it. White Nile also did not establish that any of the other investors Skinner and his father helped to recruit to invest in NeXplore would have invested in White Nile. The Court, therefore, concludes that White Nile is not entitled to an award of damages measured by the Laynes' investment of $286,500 in NeXplore or any of the other investments in NeXplore.

Order Denying Recon., Dkt. # 14-1, at p. 80–81.

### III.     ISSUES PRESENTED

Mandel raises the following issues on appeal:

(1) whether the bankruptcy court, on remand from the Fifth Circuit, erred in awarding compensatory damages to Thrasher in the amount of $1,000,000;

(2) whether the bankruptcy court, on remand from the Fifth Circuit, erred in awarding compensatory damages to Coleman in the amount of $400,000; and if so,

(3) whether the bankruptcy court erred in awarding, or refusing to set aside the attorney's fees and costs awarded to Thrasher and Coleman.

Thrasher, Coleman, and White Nile raise the following issues on cross-appeal:

(1) whether the bankruptcy court erred in determining that the Fifth Circuit did not vacate the bankruptcy court's award of $300,000 in compensatory damages to White Nile;

(2) whether the bankruptcy court erred by failing to order disgorgement of the salary and other benefits Mandel received from NeXplore from 2006 through 2009 in violation of his duty of loyalty to White Nile; and

(3) whether the bankruptcy court erred by failing to award White Nile damages for the breaches of fiduciary duty found against Mandel regarding the $286,500 the Laynes invested in NeXplore arising out of the White Nile investor presentation in December 2005.

## IV.    STANDARD OF REVIEW

District courts review bankruptcy rulings and decisions under the same standards employed by federal courts of appeal:  a bankruptcy court's findings of fact are reviewed for clear error, and its conclusions of law are reviewed de novo.  *In re Nat'l Gypsum Co.*, 208 F.3d 498, 504 (5th Cir. 2000).  A finding of fact is clearly erroneous only if, based on all of the evidence, the district court is left "with the definite and firm conviction that a mistake has been made."  *Robertson v. Dennis*, 330 F.3d 396, 701 (5th Cir. 2003).  "This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently."  *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985).  "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be

clearly erroneous." *In re Renaissance Hosp. Grand Prairie Inc.*, 713 F.3d 285, 294 (5th Cir. 2013).

Due regard must be given to the opportunity of the bankruptcy court to judge the credibility of the

witnesses. FED. R. BANKR. P. 8013; *Matter of Herby's Foods, Inc.*, 2 F.3d 128, 131 (1993).

## V.     ANALYSIS OF POINTS ON APPEAL

### A.     The bankruptcy court did not err in awarding compensatory damages to Thrasher in the amount of $1,000,000.

Mandel argues that the bankruptcy court (1) erred in awarding Thrasher damages for fraud,

breach of fiduciary duty, breach of contract, and misappropriation, and (2) erred in calculating the

amount of those damages.  On appeal, the Fifth Circuit vacated "only the [compensatory] damages

award by the bankruptcy court," and remanded the issue of compensatory damages to the

bankruptcy court solely so that the bankruptcy court could explain the evidentiary and legal basis

for the amount of damages awarded to each party.  Because the scope of the Fifth Circuit's remand

was this specific, this court will determine only whether the bankruptcy court erred in calculating

the amount of damages awarded to Thrasher.

Regarding the bankruptcy court's calculation of Coleman's damages, first, Mandel argues

that the bankruptcy court erred in not adhering to the law of the case—in essence, Mandel argues

that because the bankruptcy court rejected Thrasher's invitation to base damages on the "lost asset"

theory, Taylor's testimony, or evidence of NeXplore's fair market value in its initial Findings of

Fact and Conclusions of Law (Dkt. # 21-4), the bankruptcy court is not adhering to the law of the

case by then deciding to base its damages award on those theories on remand.  "The law-of-the-

case doctrine posits that when a court decides upon a rule of law, that decision should continue to

govern the same issue in subsequent stages in the same case."  *Med. Ctr. Pharm. v. Holder*, 634

F.3d 830, 834 (5th Cir. 2011) (internal quotations and citations omitted).  In other words, under

the law of the case doctrine, "ordinarily an issue of fact or law decided on appeal may not be

reexamined either by the district court on remand or by the appellate court on subsequent appeal." *United States v. Lee*, 358 F.3d 315, 320 (5th Cir. 2004) (internal quotations and citation omitted).

In this case, the Fifth Circuit did not affirm the bankruptcy court or the district court regarding the compensatory damages award. The Fifth Circuit vacated the bankruptcy court's award of compensatory damages and remanded this case to the bankruptcy court with instructions to explain how it arrived at its award. Therefore, anything that the bankruptcy court decided regarding compensatory damages in its initial Findings of Fact and Conclusions of Law is not the law of the case. The bankruptcy court did not err failing to adhere to those decisions. Mandel's appeal on this ground is overruled.

Second, Mandel argues that he bankruptcy court erred in basing damages awarded to Thrasher on the failed state court settlement. Upon reading the entirety of the bankruptcy court's opinion, it is clear that the bankruptcy court did not base its damages award on the failed state court settlement. The bankruptcy court merely pointed out that Thrasher argued in closing that the failed state court settlement was some evidence of a reasonable royalty rate (Dkt. # 21-7, at p. 15) and that the ultimate amount of damages that the bankruptcy court awarded to Thrasher was similar to the agreed-upon sum in the failed state court settlement (Dkt. # 21-7, at p. 17 n.8). Mandel's appeal on this ground is overruled.

Mandel next argues that the bankruptcy court erred in basing damages on Mr. Taylor's range of values. Specifically, Mandel contends that the bankruptcy court did not account for White Nile's 80% chance of failure and that the bankruptcy court's choosing a number within the range of figures offered by Mr. Taylor was impermissible. It is clear from the bankruptcy court's opinion that the bankruptcy judge considered the dynamic value of start-up companies and the large percentage of internet companies that fail, even if almost everything goes in their favor. As the

bankruptcy court stated, "[a]ll companies are people companies . . . and they succeed only if their executive team is capable of transforming an idea into a viable business," and "White Nile's executive team did not have this ability."  Mem. Op'n on Rem., Dkt. # 21-7, at p. 7.

As discussed above, Mr. Taylor selected thirty-four comparable companies focused on technology and business characteristics similar to White Nile, which ranged in value from $1 million to $344 million.  The bankruptcy court accounted for White Nile's high chance of failure by determining that the value of White Nile was $1 million, the lowest valued company in Taylor's range.  As the bankruptcy court noted,

> Taking into account the significant rate of failures, the dysfunctional executive team, the lack of a functional product, NeXplore's abandonment of its efforts to create its own search engine, and the lack of profits by White Nile and NeXplore, it appears that White Nile's value is closest to the lowest valued company on Taylor's list of companies, which is $1 million.

Mem. Op'n on Rem., Dkt. # 21-7, at p. 17.  By taking into account White Nile's high chance of failure and dysfunctional team in choosing a value within Mr. Taylor's range of values, contrary to Mandel's contentions, the bankruptcy court did not merely pick a number.  The bankruptcy court both relied on expert testimony to establish the range of values for similar companies and relied on expert testimony to choose a number within the range of values.  *See Lamont v. Vaquillas Energy Lopeno Ltd., LLP*, 421 S.W.3d 198, 224 (Tex. App.—San Antonio 2013, no pet.) (stating that expert testimony is not required to prove lost profits in misappropriation of trade secrets case); *Main Bank & Tr. v. York*, 498 S.W.2d 953, 957 (Tex. App.—San Antonio 1973, writ ref'd n.r.e.) ("The rule is well settled that [expert] testimony is nothing but evidentiary, and is never binding on the trier of facts.  Thus, the factfinder is not cut off from exercising considerable personal judgment about how far such opinions are to be relied on.").

Mandel also argues that the bankruptcy court erred in basing damages on the value of NeXplore stock and in basing damages on the amounts raised by NeXplore. Mandel lists no case law in support of his arguments in this section. These arguments are therefore inadequately briefed and waived. *In re Bouchie*, 324 F.3d 780, 786 (5th Cir. 2003) ("As [appellant] cites no authority for this proposition, it is not adequately briefed and therefore waived.").

Assuming for the sake of argument that Mandel had adequately briefed this issue, the court would find Mandel's argument meritless. The bankruptcy court did outline Thrasher and Coleman's alternate theory of damages based on the benefit that they contend Mandel received from his misappropriation, namely a 55% interest in NeXplore, the value of NeXplore stock, and the amounts raised by NeXplore. However, the bankruptcy court stated that "the trial record did not establish that Mandel received his salary or benefits on account of misappropriation," as "Mandel worked for NeXplore for a number of years—even after NeXplore abandoned any attempt to create a search engine of his own." Mem. Op'n on Rem., Dkt. # 21-7, at p. 17 n.9. It is clear from this statement as well as the remainder of the Memorandum Opinion on Remand, that the bankruptcy court disregarded Thrasher's and Coleman's arguments regarding NeXplore's stock and value in determining its award of damages.

**B.     The bankruptcy court did not err in awarding compensatory damages to Coleman in the amount of $400,000.**

Mandel argues that the bankruptcy court (1) erred in awarding Coleman damages for misappropriation, fraudulent inducement, and conspiracy and (2) erred in calculating the amount of those damages. On appeal, the Fifth Circuit vacated "only the [compensatory] damages award by the bankruptcy court," and remanded the issue of compensatory damages to the Bankruptcy Court solely so that the bankruptcy court could explain the evidentiary and legal basis for the amount of damages awarded to each party. Because the scope of the Fifth Circuit's remand was

this specific, this court will determine only whether the bankruptcy court erred in calculating the amount of damages awarded to Coleman. Related to this argument, Mandel essentially contends that the bankruptcy court erred because the bankruptcy court's damages award is akin to benefit of the bargain damages, which are not available absent a contract.

As the Fifth Circuit noted,

> [d]amages in misappropriation cases can take several forms: the value of plaintiff's lost profits; the defendant's actual profits from the use of the secret, the value that a reasonably prudent investor would have paid for the trade secret; the development costs the defendant avoided incurring through misappropriation; and a reasonable royalty.

*Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 870 (5th Cir. 2013) (internal citations and quotations omitted). To apply "a reasonable royalty as to the measure of damages is to adopt . . . the fiction that a license was to be granted at the time of beginning the [misappropriation], and then to determine what the license price should have been." *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 418, 537 (1974).[4] The proper standard in such a case is "the willing buyer-willing seller test: the primary inquiry is what the parties would have agreed upon, if both were reasonably trying to reach an agreement." *Id.* (internal citations omitted). The court must be mindful that every misappropriation of trade secrets case "requires a flexible and imaginative approach" to calculating damages and that "each case is controlled by its own peculiar facts and circumstances." *Id.* at 538 (internal citations and quotations omitted).

---

[4] Thrasher and Coleman take issue with the bankruptcy court's use of *Univ. Computing Co.* as it relies, in part, on Georgia state law in outlining the legal standards on misappropriation of trade secrets. *See Univ. Computing Co.*, 504 F.2d at 534. The court finds *Univ. Computing Co.* applicable to this case because Georgia law, like Texas law, tracks the Restatement of Torts. *Compare id.* at 534 *with SW Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 712 (Tex. 2016). Moreover, in *Univ. Computing Co.*, the Fifth Circuit cites to Fifth Circuit law, as well as the law of several other circuits, in outlining how to calculate damages for misappropriation of trade secrets. 504 F.2d at 535–38.

In this case, Coleman assigned his intellectual property rights to White Nile in exchange for a $133,000 annual salary for three years, plus a 0.5% equity interest in White Nile. The agreement between Coleman and White Nile is some evidence of the value of Coleman's intellectual property rights, and thus, evidence of the value of White Nile's trade secrets, to Mandel. Three years of Coleman's annual salary of $133,000 would have totaled $399,000. The bankruptcy court valued White Nile at $1 million. 0.5 percent of $1 million is $5,000. In sum, the value of Coleman's salary plus the value of his equity interest in White Nile, as promised under the contract, is roughly $400,000.[5] When measured against the peculiar facts and circumstances of this case, valuing the damages to Coleman for Mandel's misappropriation of Coleman's trade secrets by determining the value of Coleman's initial contract with White Nile fits within the flexible and imaginative approach used to calculate damages in a case like this one, as condoned by the Fifth Circuit in *Wellogix*. 716 F.3d at 870. Mandel's appeal on this ground is overruled.

**C.     The bankruptcy court did not err in awarding attorney's fees to the Claimants.**

Because this court affirms the bankruptcy court's award of compensatory damages to Thrasher and Coleman, the court need not consider Mandel's argument that there can be no award of attorney's fees absent an award of damages. *See also* Fifth Cir. Op'n, Dkt. # 21-6, at p. 24 ("The bankruptcy court did not abuse its discretion in awarding these [attorney's] fees."). Mandel's appeal on this ground is overruled.

---

[5] This court may affirm the bankruptcy court's judgment on any grounds supported by the record. *See, e.g.*, *Sobranes Recovery Pool I, LLC v. Todd & Hughes Constr. Corp.*, 509 F.3d 216, 221 (5th Cir. 2007).

## VI.    ANALYSIS OF POINTS ON CROSS-APPEAL

**A.    The bankruptcy court erred in holding that the Fifth Circuit did not vacate the bankruptcy court's compensatory damages award to White Nile.**

Thrasher and Coleman argue that the bankruptcy court erred in determining that the Fifth Circuit did not vacate and remand for further consideration the damages award to White Nile based upon Thrasher's derivative claims. Whether a lower court "faithfully and accurately applied" the instructions of the Fifth Circuit on remand is reviewed de novo. *Sobley v. S. Nat. Gas Co.*, 302 F.3d 325, 332 (5th Cir. 2002).

Thrasher brought claims against Mandel both individually and derivatively on behalf of White Nile. The Fifth Circuit affirmed the bankruptcy court's conclusion that "Thrasher, on behalf of White Nile, should prevail on his claims for breach of contract, breach of fiduciary duty, and fraud." Bankr. Ct. Find. of Fact & Concl. of Law, Dkt. # 21-4, at p. 53, ¶ 99; Fifth Cir. Op'n, Dkt. # 21-6, at p. 15–19 (affirming findings of bankruptcy court on these claims); Fifth Cir. Op'n, Dkt. # 21-6, at p. 25 (vacating the bankruptcy court's award of compensatory damages and remanding the case to the bankruptcy court for an explanation of its damages award and affirming the bankruptcy court in all other respects).

In part A of section VI of the Fifth Circuit's opinion, the Fifth Circuit discusses the bankruptcy's award of "$1.7 million in actual damages," which includes the bankruptcy court's award of $300,000 to White Nile. Fifth Cir. Op'n, Dkt. # 21-6, at p. 19. At the end of part A, the Fifth Circuit stated that it was unable to adequately review the bankruptcy court's compensatory damages award due to the lack of explanation of the legal or evidentiary basis for the damages. Fifth Cir. Op'n, Dkt. # 21-6, at p. 23. The Fifth Circuit also noted that because it was clear that "Thrasher and Coleman did suffer some damage," it was vacating the award of compensatory damages and remanding the case to the bankruptcy court for further explanation. Fifth Cir. Op'n,

Dkt. # 21-6, at p. 19. Even though the Fifth Circuit referred to only Thrasher and Coleman in this sentence, this court interprets the Fifth Circuit opinion as vacating and remanding the compensatory damages award to White Nile (in addition to the awards to Coleman and Thrasher, individually) because (1) Thrasher brought claims both individually and derivatively on behalf of White Nile; (2) the Fifth Circuit affirmed the findings of the bankruptcy court regarding the claims on which White Nile prevailed; and (3) the Fifth Circuit vacated the entire compensatory damages award. Thrasher's and Coleman's appeal on this ground is sustained.

**B.**     **The bankruptcy court did not err by not basing its award of damages on the disgorgement of Mandel's salary from NeXplore.**

Coleman and Thrasher argue that the bankruptcy court should have awarded White Nile the remedy of equitable disgorgement of all salary and other benefits Mandel received while working at NeXplore. Cross-Appellant Br., Dkt. # 19, at p. 31. "Under the equitable remedy of disgorgement or fee forfeiture, a person who renders service to another in a relationship of trust may be denied compensation for his service if he breaches that trust." *McCullough v. Scarbrough, Medlin & Assocs., Inc.*, 435 S.W.3d 871, 904–05 (Tex. App.—Dallas 2014, pet. denied) (citing *Burrow v. Arce*, 997 S.W.2d 229, 237 (Tex. 1999)). "The remedy essentially returns to the principal the value of what it paid for because it did not receive the trust or loyalty." *McCullough*, 435 S.W.3d at 905 (citing *Burrow*, S.W.2d at 237–38). "The amount of disgorgement is within the trial court's discretion." *McCullough*, 435 S.W.3d at 905.

In *Burrow v. Arce*, former clients sued their attorneys alleging breach of fiduciary duty arising from settlement negotiations in a previous lawsuit. 997 S.W.2d at 232–33. The Supreme Court of Texas held that the clients did not have to prove actual damages to obtain forfeiture of the attorney's fees due to their attorneys breaching their fiduciary duty in the attorney-client relationship. *Id.* at 240. For example, in *Burrow*, the clients received a disgorgement award when

their attorneys breached their fiduciary duty to those clients. 997 S.W.2d at 240. In *McCullough*, an employer received a disgorgement award after its employee breached its fiduciary duty to that employer. 435 S.W.3d at 905.

In this case, the bankruptcy court correctly noted that "all of the cases cited by White Nile require a nexus between the breach and the financial benefit or profit." Order Denying Recon., Dkt. # 14-1, at p. 12. Likewise, the bankruptcy court correctly noted that "[i]n this case, . . . White Nile failed to establish a causal connection between the salary and other benefits Mandel received from NeXplore and Mandel's breaches of fiduciary duty to White Nile." Order Denying Recon., Dkt. # 14-1, at p. 12–13. NeXplore is not a party to the fiduciary relationship between Mandel and White Nile or between Mandel, Coleman, and Thrasher. As the bankruptcy court noted, NeXplore is an entity that is separate and distinct from White Nile. White Nile did not pay Mandel's NeXplore salary. Thrasher, Coleman, and White Nile have failed to establish any connection to the salary Mandel received from NeXplore and why that salary should be subject to disgorgement or forfeiture based on Mandel's breach of loyalty or fiduciary duty to White Nile. The bankruptcy court did not err in its conclusions on this topic, and Thrasher's, Coleman's, and White Nile's arguments on this ground are overruled.

## C.   The bankruptcy court did not err by not awarding White Nile the $286,500 that the Laynes invested in NeXplore.

Thrasher, Coleman, and White Nile argue that the bankruptcy court erred in failing to award White Nile the $286,500 that the Laynes invested in NeXplore because that money represents, in part, the value of the investment opportunities that Mandel conspired to transfer to NeXplore. The bankruptcy court based its decision not to award White Nile the $286,500 that the Laynes invested in NeXplore on the corporate opportunity doctrine. "A violation of the corporate opportunity doctrine occurs when an officer or director misappropriates a business opportunity

that properly belongs to the corporation." *Alexander v. Sturkie*, 909 S.W.2d 166, 169 (Tex. App.—

Houston [14th Dist.] 1995, writ denied) (citing *Int'l Bankers Life Ins. v. Holloway*, 368 S.W.2d

567, 576–78 (Tex. 1963)). "It arises where a corporation has a legitimate interest or expectancy

in, and the financial resources to take advantage of, a particular business opportunity." *Alexander*,

909 S.W.2d at 169 (internal citation omitted).

In this case, the Laynes invested the $286,500 in NeXplore after an investor meeting with

NeXplore. The bankruptcy court correctly noted that at trial, White Nile did not establish that the

Laynes would have invested these funds in White Nile, nor did White Nile establish that any of

the other investors that the Laynes recruited to invest in NeXplore would have invested in White

Nile in any circumstance. White Nile therefore did not establish that it had a legitimate interest or

expectancy in, or the financial resources to take advantage of, the Laynes' $286,500 investment,

or any other investment in NeXplore. Thrasher's, Coleman's, and White Nile's appeal on this

ground is overruled.

**D.    This court reverses the bankruptcy court's Order Denying Reconsideration and increases the bankruptcy court's award of compensatory damages to White Nile to $497,000.**

As discussed above, this court finds that the Fifth Circuit reversed and vacated the entire

compensatory damages award, including the bankruptcy court's award of $300,000 to White Nile.

In denying Thrasher's, Coleman's, and White Nile's Motion for Reconsideration, the bankruptcy

court held that in the event that it misread the Fifth Circuit's opinion, it would increase the

$300,000 award to White Nile by $197,000, for a total award of $497,000 in compensatory

damages ("Order Denying Reconsideration"). Order Denying Recon., Dkt. # 14-1, at p. 81. This

court agrees. Mandel breached his duty of loyalty to White Nile by diverting the remaining

$197,000 of the investment made by the Laynes, and in doing so, deprived White Nile of

investment opportunities with respect to those funds, in violation of the corporate opportunity doctrine. The court therefore reverses in part the bankruptcy court's Order Denying Reconsideration and increases the amount of compensatory damages to White Nile by $197,000 for a total of $497,000.

## VII.   CONCLUSION

IT IS THEREFORE ORDERED that the Bankruptcy Court's March 23, 2016 Order Denying Reconsideration is **AFFIRMED IN PART** and **REVERSED IN PART**. The Bankruptcy Court's award to White Nile is increased from $300,000 to $497,000.

IT IS FURTHER ORDERED that the bankruptcy court's March 23, 2016 Order Denying Reconsideration and September 30, 2015 Memorandum Opinion and Order on Remand are affirmed in all other respects.

So **ORDERED** and **SIGNED** this **20** day of **December, 2016.**

_____
Ron Clark, United States District Judge